# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MARK ANDERSON, | ) | |
| | ) | |
| Petitioner, | ) | No. 17 C 08350 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| JACQUELINE LASHBROOK, | ) | |
| | ) | |
| Respondent. | ) | |

### MEMORANDUM OPINION AND ORDER

Mark Anderson has filed a *pro se* petition for a writ of habeas corpus, 28 U.S.C. § 2254, challenging his 2010 state court convictions for first-degree murder, aggravated discharged of a firearm, and each offense's corresponding firearm-enhancement charge.[1] R. 1, Habeas Pet. Anderson asserts that the trial court erred in instructing the jury on the firearm-enhancement charges; that there was insufficient evidence to convict him for aggravated discharge of a firearm, and the prosecutor misstated the evidence against him; and finally, ineffective assistance of counsel. Habeas Pet. at 6-8. For the reasons that follow, Anderson's habeas petition is denied. But because the aggravated-discharge conviction is a close enough question, a certificate of appealability shall be granted for that claim only.

---

[1]This Court has subject matter jurisdiction over the case under 28 U.S.C. § 2241. Citation to the docket is "R." followed by the entry number and, when necessary, the relevant page or paragraph number.

## I. Background

When considering habeas petitions, federal courts must presume that the factual findings made by the last state court to decide the case on the merits are correct, unless the petitioner rebuts those findings by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Coleman v. Hardy*, 690 F.3d 811, 815 (7th Cir. 2012). Here, nearly each of Anderson's claims was last reviewed in a different state court opinion. The jury-instruction issue was last substantively reviewed by the Illinois Appellate Court in 2012, *People v. Anderson*, 977 N.E.2d 222 (Ill. App. Ct. 2012) ("*Anderson I*"); the sufficiency-of-evidence and prosecutorial-misconduct claims were last substantively reviewed by the Illinois Appellate Court in 2015, *People v. Anderson*, 2015 WL 7967325 (Ill. App. Ct. Dec. 5, 2015) ("*Anderson II*"); and the claim for ineffective assistance of counsel was last reviewed by the Illinois Appellate Court in 2017, *People v. Anderson*, 2017 WL 1265249 (Ill. App. Ct. Mar. 31, 2017) ("*Anderson III*"). Because federal courts must "review the decision of the last state court that *substantively* adjudicated each claim," *Gonzales v. Mize*, 565 F.3d 373, 379 (7th Cir. 2009) (cleaned up) (emphasis added), this Court will move from opinion to opinion for each respective claim.[2] Overall, however, Anderson has not provided clear and convincing evidence to rebut the presumption of correctness here, so the factual background is taken from the state court findings. Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts, the facts are also

---

[2]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

supplemented where appropriate by the state court record lodged with this Court. *See Todd v. Schomig*, 283 F.3d 842, 846 (7th Cir. 2002).

## A. Trial

In July 2008, Mark Anderson walked into a restaurant with Quentin Cooper and Centrell Jackson. R. 14-7, Exh. G, *Anderson I* at 2.[3] At the time, at least two men were already in the restaurant: Darryl Hart and Ozier Hazziez. *Id.* Long story short, Hart got into an argument with Anderson's group, and shots were fired. *Id.* Hart ended up being killed. *Id.* at 4. Hazziez drove away as more shots were fired. *Id.* at 2. Anderson was eventually arrested and charged for the shootings. *Id.* at 1.

Following a jury trial in 2010, Anderson was convicted of the first-degree murder of Hart, the attempted murder of Hazziez, and the aggravated discharge of a firearm in the direction of Hazziez's occupied car. *Anderson I* at 1. For those convictions, Anderson was sentenced to a total of 71 years in state prison. *Id.*

During trial, the jury heard testimony from Hazziez, Cooper, and Jackson. First, Hazziez told the jury that shortly after 2:00 a.m. on July 25, 2008, he went to Orbitz Submarine Shop at 71st Street and Euclid Avenue in Chicago. R. 14-16, *Anderson II* at 1. According to Hazziez, the only other patron in the shop at that time was Hart, the murder victim. *Id.* After Hazziez placed an order for food, he saw Anderson, Cooper, and Jackson walk into the shop as a group. *Id.* An "older guy" came in sometime after that. R. 14-2, Trial Tr. at 12:9-11. Hazziez testified that, when he

---

[3]The three appellate court opinions are attached as exhibits to the state court record at R. 14. For ease of reference, citations to the opinions will refer to the version of the opinion attached to the record, and page numbers will refer to the page number of the record exhibit.

was waiting for his food, he saw either Anderson, Cooper, or Jackson sell drugs to another person inside the sub shop. *Anderson II* at 1. He did not specify who the other individual was. But after the drug deal wrapped up, Hart approached Anderson, Cooper, and Jackson; Hart then started an argument because they apparently sold in Hart's "area." *Id.* According to Hazziez, as the argument in the shop began to escalate, Hart and Cooper stepped outside the shop. *Id.* Hazziez himself also stepped outside. *Id.* Anderson then left the shop to confront Hart, at which point Hazziez heard Hart say, "You might as well just shoot me." *Id.* Hazziez then saw Anderson fire at Hart, and Hart immediately fell to the ground. *Id.* at 1-2.

Hazziez testified that, after he saw Anderson shoot Hart, Hazziez ran to his car and took off. *Anderson II* at 2. Hazziez's car was one of only two cars parked outside the shop at the time of the shooting. *Id.* Hazziez then explained that, while he was driving away, he heard three more gunshots, but he could not tell in what direction they were fired. *Id.* Later, it turned out that his car did not have any bullet-hole markings. *Id.* Nor was Hazziez himself directly hit. *Id.* Shortly after the shooting, Hazziez went to a police station, but he was not able to identify Anderson in a photo array. *Id.* Three weeks later, though, during a physical lineup, Hazziez identified Anderson as the shooter. *Id.*

Next, Cooper took the stand and told a very different story from Hazziez. Specifically, Cooper testified that no shooting, no drug deal, and no argument with Hart had occurred, and that Cooper and Jackson left the sub shop that night without any incident. *Anderson II* at 2. In addition to contradicting Hazziez's testimony,

Cooper's trial testimony also directly contradicted his own previous written statement and grand jury testimony, both of which he claimed at trial were coerced on threat of charging Cooper with the murder and shooting. *Id.* Nonetheless, Cooper's written statement and grand jury testimony were both introduced to impeach his trial testimony. *Id.* In those earlier statements, Cooper had claimed that Anderson shot and killed Hart before turning to shoot at another individual who was standing outside at the time of the shooting. *Id.* at 3. Specifically, Cooper described how Anderson had to reach around Cooper in order to shoot Hart once in the chest. *Id.* After Hart fell to the ground, Anderson then shot Hart two more times. *Id.* Then, Anderson turned to shoot twice at "another guy who was in the sub shop earlier but was standing outside" at the moment that Anderson shot Hart. *Id.* That other guy, according to Cooper's statements, "[j]umped into his car and rode off." *Id.*

Finally, Jackson took the stand to tell, in Rashomon-like fashion, yet another version of what happened. First, Jackson testified that when he entered the sub shop with Anderson and Cooper, Hart was with another person. *Anderson II* at 3. Jackson also admitted that he (Jackson) was specifically the one who sold drugs on Hart's "turf." *Id.* But unlike Hazziez's version, in which the drug deal happened inside the shop, Jackson testified that the drug deal actually happened outside the shop's entrance. *Id.* Jackson also did not witness the shooting or the shooter, but he did hear three or "maybe four at the most" gunshots outside while he was still inside the shop waiting for his food. *Id.*

5

The jury also heard from several police officers and forensic experts, *Anderson III* at 2-3, though that testimony was of limited value. Also, the parties stipulated that a jacket belonging to Anderson may not have contacted gunshot residue and "may not have been in the environment of a discharged firearm." *Id.* at 3. Anderson himself waived his right to testify. *Id.* In response to admonishments from the trial judge, Anderson clarified that his decision was given freely and knowingly. *Id.*

After jury instructions and closing arguments were given, the jury convicted Anderson for the first-degree murder of Hart, the attempted murder of Hazziez, and aggravated discharge of a firearm in the direction of Hazziez's occupied car. *Anderson I* at 5. The jury also found that Anderson personally discharged a firearm during the commission of the murder and attempted-murder offenses, which meant that the firearm-enhancement charges would apply. *Id.* The trial court then sentenced Anderson to a total of 71 years for the convictions, with the aggravated-discharge conviction merging into the attempted-murder conviction. *Anderson II* at 1.

### B. First Direct Appeal

In September 2011, Anderson filed his first direct appeal, pointing primarily to two errors. First, Anderson argued that the trial court erred in giving the jury the firearm-enhancement instructions in a different sequence than the instructions allegedly appear in the Illinois Pattern Jury Instructions. R. 14-4, Exh. D at 1, 6. Second, Anderson argued that the trial court erred by instructing the jury that the subject of the attempted-murder charge was just an "individual," instead of specifically asking the jury to consider Hazziez as the victim; without that

6

clarification, the jury might have found Anderson guilty of the attempt charge without finding that he had the specific intent to kill Hazziez. *Id.* at 1.

In August 2012, the Illinois Appellate Court held that Anderson had forfeited the jury-instruction claim because he failed to object to the instruction at trial and also failed to raise the issue in a post-trial motion. *Anderson I* at 7. Moreover, the court held that there was no plain error in the reading of the firearm-enhancement instruction. The appellate court explained that "[e]ven when a trial court gives faulty instructions, a reviewing court will not review a trial court's decision unless the instruction clearly misled the jury and resulted in prejudice to the defendant." *Anderson I* at 8 (cleaned up). And here, the appellate court reasoned, the trial court "incontestably" provided the jury with a complete statement of the applicable and correct law such that the state still carried the burden of proving each element of the offense beyond a reasonable doubt. *Id.* Anderson filed for leave to appeal this decision, but the Illinois Supreme Court denied the petition. R. 14-10, Exh. J at 1.

The Illinois Appellate Court did, however, hold that the trial court's failure to specify the attempted-murder victim did constitute plain error. *Anderson I* at 1. Specifically, the appellate court agreed with Anderson that the instruction to only consider "an individual" instead of Hazziez specifically meant that the jury could very well have convicted Anderson based on an erroneous finding that he attempted to murder *anyone*, including Hart, instead of finding that he specifically attempted to murder Hazziez. *Id.* at 10. That was a plain error because the evidence for the attempted murder of Hazziez was "closely balanced." *Id.* at 11. As the appellate court

7

noted, the only two real pieces of evidence on this charge were the testimonies of Hazziez and Cooper; Hazziez only testified that he heard more shots as he was driving away, while Cooper only testified that he saw Anderson shoot "another person" after shooting Hart, but without specifying whether that "other person" was Hazziez. *Id.* Thus, the appellate court held that the flawed jury instruction could have tipped the scale in favor of conviction because the evidence was closely balanced. *Id.* As a result, the appellate court overturned the attempted-murder conviction and remanded for a new trial on the attempted-murder charge. *Id.* at 12.

On remand, the trial court granted the state's motion to voluntarily dismiss the attempted-murder charge and then went ahead and imposed a sentence for the aggravated-discharge conviction (remember that this conviction had previously merged into the attempted-murder conviction, which itself was now vacated). *Anderson II* at 1. The aggravated-discharge conviction carried a sentence of six years in prison, which the trial court ordered to be served consecutively to the 45-year term for first-degree murder, for a new total of 51 years in prison. *Id.*

## C. Second Direct Appeal

In March 2015, Anderson filed a second direct appeal, this time challenging the aggravated-discharge conviction and sentence. R. 14-12, Exh. L at 1. Anderson argued that the aggravated-discharge conviction should be reversed because there was no evidence that he shot at Hazziez's car, or, in the alternative, that the court should remand for a new trial on the aggravated-discharge charge because the prosecutor misstated the evidence during closing arguments. *Id.* at 2-3.

8

In December 2015, the Illinois Appellate Court affirmed the aggravated-discharge conviction, rejecting Anderson's claims of insufficient evidence and prosecutorial misconduct. R. 14-16, *Anderson II* at 6. As the appellate court explained, the standard of review for sufficiency of the evidence was whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (cleaned up). And here, the appellate court reasoned, there was sufficient evidence to prove that Anderson shot at Hazziez's car. *Id.* at 4. First, the appellate court credited Hazziez's testimony that he heard "three more gunshots" after he had gotten into his car and was driving away. *Id.* Then, the appellate court pointed to Cooper's testimony (taken from his written statement and grand jury testimony) that Anderson shot twice at "another guy who was in the sub shop earlier but was standing outside" at the time Anderson shot Hart. *Id.* The appellate court concluded that, viewing these two pieces of testimony in the light most favorable to the prosecution, there was sufficient evidence to suggest that Anderson shot at Hazziez's car. *Id.* at 5.

The Appellate Court also rejected Anderson's claim that the prosecutor misstated evidence during closing argument. *Anderson II* at 6. Specifically, Anderson had claimed that the prosecutor argued that Cooper testified that he saw Anderson shoot in the direction of *Hazziez*'s car. *Id.* at 5. As discussed above, Cooper actually testified that he saw Anderson shoot at *another guy*, but never specified that it was Hazziez. According to the appellate court, however, prosecutors are "afforded wide latitude in the content of their closing arguments," and in this case, the prosecutor was certainly allowed to draw reasonable inferences from the testimony and present

those reasonable inferences to the jury during closing arguments. *Id*. at 6. Thus, the appellate court concluded that there was no plain error in the prosecutor's statement of the evidence, so the court rejected Anderson's request for a new trial. *Id*. In May 2016, the Illinois Supreme Court again denied Anderson's petition for leave to appeal. R. 14-18, Exh. R at 1.

### D. Post-Conviction Proceedings

Meanwhile, in April 2014, Anderson filed a post-conviction petition, alleging that his trial counsel was ineffective because the counsel: (1) entered into the gunshot-stipulation without Anderson's consent; (2) did not visit Anderson in jail, keep him informed of the evidence against him, allow him to make an informed decision about his right to testify, and in fact coached him not to testify; and (3) did not interview any witnesses. R. 14-19, Exh. S at 3.

In September 2014, the trial court summarily dismissed the post-conviction petition. R. 14-20, Exh. T at 11. On the first two issues, the court held that Anderson did not adequately allege prejudice so as to plausibly plead a claim of ineffective counsel. *Id*. at 5. On the third issue, the court rejected the ineffective-assistance claim because Anderson failed to provide any information or affidavits identifying the witnesses that his counsel should have interviewed or what those witnesses would have said. *Id*. at 11. So, the court rejected all three claims. *Id*. Anderson then filed his third appeal in this case. R. 14-21, Exh. U.

In March 2017, the Illinois Appellate Court affirmed the summary dismissal of Anderson's post-conviction claims. R. 14-24, *Anderson III* at 1. The appellate court

explained that the governing legal standard for ineffective assistance of counsel claims, set forth in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), required Anderson to show that (1) his counsel's performance fell below an objective standard of reasonableness, and (2) he was prejudiced by his counsel's performance. *Anderson III.* at 6 (cleaned up). Based on that framework, the appellate court rejected Anderson's first claim—that his counsel stipulated to the gunshot-residue evidence without his consent—because Anderson failed to show how that decision prejudiced him. *Id.* at 8. Similarly, the appellate court rejected Anderson's second claim—that his counsel failed to visit him, inform him of the evidence against him, and properly advise him on his right to testify—because the court found that Anderson failed to show how his counsel's failure to communicate prejudiced him, given how *not* closely balanced the evidence was against him. *Id.* at 6.

Finally, the appellate court did not reach the merits of the third issue—his counsel's failure to interview witnesses—because Anderson had forfeited that claim on procedural grounds. *Id.* at 7. As the appellate court explained, Illinois law requires a post-conviction petitioner to attach factual information to a petition, or otherwise explain the absence of such information. *Id.* And here, Anderson did not attach any affidavits from Jackson or Cooper, or otherwise explain their absence, to support his ineffective-assistance claim. So, the appellate court affirmed the dismissal of that claim as well. *Id.* In September 2017, the Illinois Supreme Court once again denied Anderson's petition for leave to appeal. R. 14-26, Exh. Z at 1.

### E. Federal Habeas Petition

Now, Anderson has filed a federal habeas petition. *See* Habeas Pet. In the petition, he brings four claims. First, Anderson argues that he was denied a fair trial when the trial judge instructed the jury on the firearm-enhancement offenses in a manner inconsistent with the directions of the Illinois Pattern Jury Instructions. *Id.* at 6. Second, Anderson claims that there was insufficient evidence to support his conviction for aggravated discharge of a firearm. *Id.* Third, Anderson argues that he was denied a fair trial because the prosecutor misstated the evidence for the aggravated-discharge charge during closing arguments. *Id.* Finally, Anderson contends that his attorney failed to (1) get Anderson's consent before stipulating to the gunshot-residue evidence; (2) communicate with Anderson regarding his right to testify; and (3) interview any of the witnesses in the case. *Id.* at 7-8. Naturally, the government asks this Court to deny Anderson's petition. R. 15, State's Answer.

### II. Standard of Review

A petition for habeas corpus is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). A state petitioner seeking a writ of habeas corpus in federal court must first exhaust the remedies available in state court, 28 U.S.C. § 2254(b)(1)(A), "thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Cheeks v. Gaetz*, 571 F.3d 680, 685 (7th Cir. 2009) (cleaned up). This means that a state petitioner must fully and fairly present federal claims through one complete round of the state appellate review process before filing a federal habeas

petition. *Smith v. Gaetz*, 565 F.3d 346, 352 (7th Cir. 2009). If a petitioner has failed to properly assert federal constitutional claims at each level of state review, then the claims are procedurally defaulted. *Woods v. Schwartz*, 589 F.3d 368, 373 (7th Cir. 2009).

Alternatively, a claim is also procedurally defaulted when a petitioner fails to raise federal claims in compliance with state procedural rules, making the state court's refusal to decide the merits of the claims an independent and adequate state ground for denying federal review. *Kaczmarek v. Rednour*, 627 F.3d 586, 591 (7th Cir. 2010). Under this second way, the state court must have actually relied on the state procedural bar as an independent basis in deciding the case. *Smith v McKee*, 598 F.3d 374, 382 (7th Cir. 2010). Either way, procedural default precludes federal court review of a petitioner's habeas claims. *See Mulero v. Thompson*, 668 F.3d 529, 536 (7th Cir. 2012).

A habeas petitioner may overcome procedural default either by demonstrating cause and actual prejudice from the default, or by showing that the federal court's refusal to consider the claim would result in a fundamental miscarriage of justice. *Kaczmarek*, 627 F.3d at 591. A fundamental miscarriage of justice occurs when a habeas petitioner establishes that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

Even if a habeas petitioner has exhausted administrative remedies or overcome a defaulted claim, still a federal court may only grant habeas relief for a

state-court conviction if the habeas petitioner meets one of two statutory requirements: (1) the state-court decision involved an unreasonable application of clearly established federal law, 28 U.S.C. § 2254(d)(1), or (2) the decision was based on an unreasonable determination of the facts in light of the evidence presented during the state-court proceeding, 28 U.S.C. § 2254(d)(2). Under the "unreasonable application of law" avenue, a federal court can grant relief only if the state court's decision was "objectively" unreasonable, not merely an incorrect or erroneous application of Supreme Court precedent. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). This standard is difficult to meet because "a state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 131 (2011). As for the "unreasonable determination of the facts" avenue, a petitioner must demonstrate that the state court decision "rests upon fact-finding that ignores the clear and convincing weight of the evidence." *McManus v. Neal*, 779 F.3d 634, 649 (7th Cir. 2015) (cleaned up). The state court decision "must be so inadequately supported by the record as to be arbitrary and therefore objectively unreasonable." *Alston v. Smith*, 840 F.3d 363, 370 (7th Cir. 2016) (cleaned up). Similar to the unreasonable-law analysis, the unreasonable-facts analysis incorporates a deferential standard that sets a high bar for a state habeas petitioner to overcome.

### III. Analysis

Having spent nearly a decade litigating his claims in state court, Anderson now asserts four claims in support of his federal habeas petition: (1) the trial court erred in instructing the jury on the firearm-enhancement charges; (2) there was insufficient evidence on the conviction for aggravated discharge of a firearm; (3) the prosecutor misstated the evidence on the aggravated-discharge offense during closing arguments; and (4) his counsel was ineffective for stipulating to the gunshot-residue evidence, failing to properly advise Anderson about his right to testify, and neglecting to interview witnesses before trial. Habeas Pet. at 6-8. For the reasons explained below, Anderson's petition is denied, but a certificate of appealability will issue on the insufficient-evidence claim.

### A. Jury Instructions for the Firearm Enhancement

First, Anderson argues that the trial court erred when it gave the firearm-enhancement jury instructions "in a manner contradicting" the Illinois Pattern Jury Instructions. Habeas Pet. at 5. "Manner contradicting" is rather vague, but in state court, this issue was first presented in the direct appeal as an alleged error in the sequence in which the instructions were read to the jury. R. 14-4, Exh. D at 1, 6. In response, the State contends that this claim has been procedurally defaulted. State's Answer at 7. The State is correct.

As mentioned earlier, when a state court refuses to reach the merits of a petitioner's claim based on an independent and adequate state-based procedural ground, then a federal court cannot entertain the claim on habeas review. *Kaczmarek*,

627 F.3d at 591. Here, the jury-instruction issue was last substantively reviewed by the Illinois Appellate Court in 2012 as part of Anderson's first direct appeal. *See Anderson I.* In that decision, the court refused to decide the merits of the claim because Anderson failed to preserve the challenge for appeal. *Id.* at 7. Specifically, in order to preserve the jury-instruction challenge under Illinois law, Anderson's trial counsel was required to object contemporaneously during the trial and then raise the issue in a post-trial motion. *Anderson I* at 8; *see also, e.g., People v. Herron*, 830 N.E.2d 467, 472-73 (Ill. 2005). That did not happen. For that reason, the jury-instruction claim has been procedurally defaulted because the Illinois Appellate Court refused to reach the merits of that claim based on an independent and adequate procedural ground. For the sake of completeness, the Illinois Appellate Court did conduct a plain-error analysis, holding that even if the jury instruction was an error, the error did not rise to the level of a plain error necessary to overcome Anderson's failure to object and raise the issue post-trial. *Anderson II* at 8-9. As the Seventh Circuit has explained, though, that plain-error review does not vitiate the default. *Miranda v. Leibach*, 394 F.3d 984, 992 (7th Cir. 2005).

It is possible for a petitioner to overcome procedural default if he "can establish cause and prejudice for the default or that the failure to consider the claim would result in a fundamental miscarriage of justice." *Kaczmarek*, 627 F.3d at 591. Here, for instance, Anderson could have asserted an ineffective assistance of counsel argument based on his lawyer's failure to raise the issue during trial and in post-conviction proceedings. *See Gray*, 598 F.3d at 330. But Anderson did not raise any

argument like that in his federal habeas petition. (Even though he *did* raise an ineffective-assistance claim as part of his direct appeal, *Anderson I* at 9, the federal petition failed to present the claim here as good cause to excuse the default). So procedural default blocks consideration of the merits of this claim.

### B. Insufficient Evidence

Next, Anderson argues that there was insufficient evidence to support his conviction for aggravated discharge of a firearm in the direction of Hazziez's occupied car. Habeas Pet. at 5. For the reasons explained below, this is a close call, but ultimately, given the deferential standard of review, this claim is rejected. A certificate of appealability, however, will be issued for this claim.

The insufficient-evidence claim was properly raised through one full round of state court review (starting with the 2015 second direct appeal). *See Anderson II* at 1; R. 14-17, Exh. Q at 1. So there is no procedural default and the Court can go ahead and review the merits of the Illinois Appellate Court's 2015 decision. On the merits, the appellate court analyzed Anderson's insufficient-evidence claim under the legal framework articulated by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *Anderson II* at 4. That is, the appellate court asked "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

That was the correct legal standard for insufficient-evidence claims under the Due Process Clause, so the only way for Anderson to prevail on habeas review is if the Illinois Appellate Court decision applied the legal standard unreasonably. 28

U.S.C. § 2254(d)(1). What that means is that the Court "may only overturn the Appellate Court's finding of sufficient evidence if it was objectively unreasonable." *Maier v. Smith*, 912 F.3d 1064, 1074 (7th Cir. 2019) (cleaned up). It is worth bearing in mind that the Illinois Appellate Court itself was required to apply a deferential standard of review to the original jury finding on the aggravated-discharge offense: as long as any *rational* trier of fact could find that the evidence supported the conviction, then the appellate court was required to affirm that finding. Now, under the "objectively unreasonable" standard at the habeas stage, the Illinois Appellate Court's holding on the rational-trier-of-fact question can only be overturned if it was "well outside the boundaries of permissible differences of opinions." *Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003).

Turning now to the substance of the state court holding, state law supplies the elements of the aggravated-discharge offense. *Coleman*, 556 U.S. at 655. Under Illinois law, Anderson committed aggravated discharge of a firearm if he knowingly or intentionally discharged a firearm in the direction of a vehicle that he knew or reasonably should have known was occupied by a person. *See* 720 ILCS 5/24–1.2(a)(2). Even though the statute defines aggravated discharge as in the direction of a person *or* an occupied vehicle, the jury in this case was only instructed to decide whether Anderson was guilty of knowingly or intentionally firing at an occupied vehicle. Trial Tr. at X-184:9-11. So, the relevant question is whether there was enough evidence to support Anderson's conviction for aggravated discharge of a firearm in the direction of Hazziez's occupied car.

On that question, the Illinois Appellate Court held that there was a reasonable inference that Anderson shot at Hazziez's car based on a combined reading of the testimonies of Hazziez, Cooper, and Jackson. First, the appellate court noted that Hazziez testified that he heard three shots fired when he was in his car. *Anderson II* at 4. Second, the appellate court credited Cooper's written statement and grand jury testimony that Anderson shot twice at "another guy who was in the sub shop earlier but was standing outside" at the time Anderson shot Hart, *id.*, which reasonably could describe Hazziez. Finally, the appellate court reasoned that, according to both Hazziez's own testimony and Jackson's testimony, Hazziez fit the description of someone who had been inside the sub shop earlier. *Id.* at 5. Taking all of this testimony in the light most favorable to the jury's verdict, the appellate court concluded that "Hazziez was in his vehicle when the second round of shots were fired, and therefore, when defendant shot at Hazziez, he necessarily had to shoot at the vehicle occupied by Hazziez." *Id.*

To be clear, this conclusion required the appellate court (and, before that, the jury) to make two separate inferences about the trial testimony. First, the appellate court would have had to interpret Cooper's statement, which referenced "another guy," to specifically describe Hazziez. Second, the appellate court would have had to infer that Anderson shot at Hazziez while he was sitting in his *car*, as opposed to while he was just standing outside. (Remember, the jury was only instructed on the occupied-vehicle element of the aggravated-discharge charge.)

19

In the Court's view, as detailed in the next subsection, this is a much closer call than the appellate court decision characterizes it. That is, both of the inferences that the appellate court relied on to arrive at its conclusion—that Anderson "necessarily" shot at Hazziez's car—are not clear cut. But given the double layer of deference required on habeas review, it is not enough that this Court might reach a different conclusion on the issue. The appellate-court decision has to be objectively unreasonable, a high bar that is not quite met here. Nonetheless, it is still worth walking through the trial evidence and discussing what the appellate court considered and what the court omitted from its analysis.

### 1. Inference that Anderson Shot at Hazziez

The initial inference needed to arrive at the conclusion that Anderson shot Hazziez's occupied car was that Anderson shot at Hazziez, as opposed to a different person. On this point, the most direct evidence is Cooper's written statement that after Anderson shot Hart, Anderson then turned around and started firing at "another guy who was in the sub shop earlier but was standing outside" when Anderson shot Hart. *Anderson II* at 4-5. Assuming that the only people at the scene were Anderson, Hart, Cooper, Jackson, and Hazziez, then this description would seem to narrow down the only possible candidate to Hazziez.

But what if there had been another person in the sub shop before the shooting started? During trial, Hazziez testified that an "older guy" came into the store *after* Anderson, Cooper, and Jackson all arrived. Trial Tr. at 12:5-11. According to Hazziez, after the "older guy" walked in, "somebody must have sold him drugs or something."

*Id*. at 12:12-15. It is clear that "older guy" does not refer to Hart, Anderson, Cooper, or Jackson because, throughout the testimony, Hazziez refers to all four of them with different descriptors ("the man on the phone" for Hart, and then "short," "tall," and "heavyset" for Anderson's group of three). The appellate court makes no mention of this "older guy." When this testimony is pieced together with Cooper's description of the shooting victim, the "another guy" that Cooper mentions could very well have referred to someone other than Hazziez. Similarly, Cooper's grand jury testimony described the second person who Anderson shot at as someone who entered the sub shop and ordered food *after* Cooper, Anderson, and Jackson arrived. Trial Tr. at 89:9-13. According to Hazziez's own testimony, though, he was *already* in the sub shop and had *already* ordered food before Cooper, Anderson, and Jackson arrived. *Id*. at 11:21-24. If the person who Anderson shot at came into the shop and ordered food *after* Anderson, Cooper, and Jackson arrived, then the person that Anderson shot was not necessarily Hazziez. The appellate court also did not mention this part of Cooper's grand jury testimony, even though it did credit the "another guy" portion of that testimony. *See Anderson II* at 3.

Also muddying the waters: the appellate court did also mention Jackson's testimony in support of this point, but without identifying which part of the testimony it was relying on. According to Jackson, when he walked into the shop with Cooper and Anderson that night, Hart was speaking with another man. Trial Tr. at 122:2-5. Jackson, however, does not remember whether the man speaking with Hart ever left the sub shop that night. *Id*. at 122:2-9. And then after the drug deal (which Jackson

testified happened *outside* the shop, not inside, as Hazziez claims, *id*. at 120:18-20), "there was a lot of arguing, everybody." *Id*. at 121:15-16. Jackson specified that "everybody" included Hart "and all his friends." *Id*. at 121:17-19. To be fair, it is entirely possible that the other man speaking with Hart inside the store in Jackson's testimony could have simply been Hazziez, as opposed to a third person, but the fact that Jackson did not see that person leave the shop supports an inference that Hart was in fact talking to a third person when the group arrived. Moreover, the reference to Hart "and all his friends," plural, again suggests that there were other bystanders in the shop besides just Hazziez.

Given the inconsistencies between the testimonies of Hazziez, Jackson, and Cooper about who was in the sub shop and who walked out of the sub shop, the evidence is—at the very least—closely balanced as to the identity of the victim of the aggravated discharge of a firearm. Indeed, the appellate court that heard Anderson's first direct appeal in 2012 held that the evidence was closely balanced as to whether Anderson shot at Hazziez at all, for purposes of overturning the attempted murder charge. *Anderson I* at 11. It is also worth noting that the lone dissenter to the 2012 decision went even further than the majority by recognizing that were other patrons in the sub shop that night and that the State's evidence against Anderson for the attempted murder of Hazziez was "woefully inadequate." *Id*. at 12. So, whether Anderson even fired at Hazziez is a close call.

22

### 2. Inference that Anderson Shot at Hazziez in Car

Even if it was reasonable to infer that Anderson did shoot at Hazziez, the aggravated-discharge conviction cannot stand unless Anderson shot at Hazziez while he was in his *car*. On this point, the most direct evidence is Hazziez's testimony that Anderson fired shots *while* Hazziez was driving away from the scene. *See Anderson II* at 4. But Hazziez could not specify the direction in which Anderson fired his gun, nor was his car struck with any bullets (though that is not dispositive, of course). *Id.*

To understand this inference, it is useful to briefly walk through a timeline of the gunshots. At most, Anderson fired five bullets. As the 2012 Illinois Appellate Court recounted, forensic experts found five cartridge cases at the scene. *Anderson I* at 4. Hazziez testified that he saw Anderson shoot Hart and then heard Anderson fire three more shots. *Id.* at 2. Cooper, in his written statement, testified that Anderson initially fired one shot at Hart, and after Hart fell, Anderson fired two more shots at Hart. *Id.* at 3. After those three shots, Anderson then fired two more shots at "another man." *Id.* As for Jackson, he testified that he heard a total of three or four shots but did not see anything because he was inside the store at the time. *Id.* at 4. Later, forensic experts found the five cartridge cases, and the parties stipulated that Hart had suffered from "multiple gunshot wounds." *Id.*

On that evidence, it is relatively clear that the first shot was directed at Hart. It is also relatively clear that at least a second shot (if not more) was also directed at Hart. That just leaves, at the most, two or three final shots that Anderson fired at another person. The appellate court relied on Hazziez's testimony that, after the

initial shots directed at Hart, but *before* Anderson fired three more shots, Hazziez fled in his car. *Anderson II* at 5. According to the appellate court, this testimony matched up with Cooper's written statement, in which he identified the second shooting victim as someone who had been in the sub shop earlier and was standing outside at the time Anderson shot Hart. *Id*. Moreover, the appellate court pointed to the fact that there were only two cars parked outside the sub shop at the time: Hazziez's car and Cooper's car. *Id*. Because there was no basis to believe that Anderson shot at Cooper's car, the only reasonable inference, according to the appellate court, was that Anderson fired the remaining shots at Hazziez's car as he was driving away. *Id*.

But all of that still assumes that Anderson shot at the second person while that person was *in a car*. And the problem with that assumption is that Cooper's grand jury testimony actually contradicts the inference that Anderson fired at the second person while that person was driving away. Specifically, Cooper stated that after Anderson shot Hart, Anderson turned and shot a different person "twice." Trial Tr. at 96:8-17. In response, that other person "jumped into his car and rode off." *Id*. at 96:18-21. Taken together, Cooper's written statement and grand jury testimony strongly suggest that Anderson shot at another person while that person was standing outside the shop—not while the person was driving away in his car. Only *after* Anderson fired shots at the person did he jump into his car and drive off. On top of that, Hazziez only testified to *hearing* shots while he was driving away. It is thus entirely possible that what Hazziez heard was Anderson shooting at a third person

24

before that person got into a car and drove off. The appellate court did not address this part of Cooper's grand jury testimony either.

In short, the conclusion that Anderson shot in the direction of Hazziez's occupied car rests on two inferences: Anderson both had to shoot at Hazziez *and* had to shoot at Hazziez while he was inside his car. If either of those inferences is undermined, then the conviction cannot stand. As the foregoing analysis has shown, the evidence on both of those inferences is closely balanced. Having said that, the Court recognizes that the inference that Anderson generally shot at Hazziez is probably reasonable. Even if it is ultimately true that there were other people in the shop besides Hazziez who could have been the other target of Anderson's shots, a rational jury could still have reasonably inferred that, among those choices, Anderson shot at Hazziez, given that Hazziez did fit Cooper's description of "another guy who had been in the sub shop earlier" and walked outside later. *See Anderson II* at 3.

The second inference, however, is weaker. Really, the only basis for the jury's conclusion that Anderson shot at Hazziez's *car* is the initial inference that Anderson shot at *Hazziez*, and then because Hazziez heard shots as he was driving away, then those shots must have been aimed at Hazziez's car. But that does not gel with Cooper's grand jury statement, which suggested that Anderson shot at a person *before* that person jumped into their car. Perhaps in overcoming these inconsistencies, the appellate court reasoned that a rational jury could have relied on a piecemeal interpretation of the testimonies of Cooper, Jackson, and Hazziez—that is, the jury is allowed to pick and choose which parts of which testimonies it chooses to believe,

25

and it could very well be the case that the jury simply chose to discount Cooper's grand jury testimony about Anderson shooting at the person *before* they got into their car, while simultaneously choosing to credit *other* parts of that same testimony by Cooper. After all, the events were chaotic and variation in eyewitness testimony is not surprising.

In any event, given the deferential double-layered standard of habeas review, it was not objectively unreasonable for the appellate court to conclude that any rational factfinder *could have* decided that Anderson shot at Hazziez while Hazziez was driving away in his car. So this claim is denied, but the Court will issue a certificate of appealability on it.

### C. Misstatement of Evidence

Relatedly, Anderson argues that the aggravated-discharge conviction should be overturned because the prosecutor misstated the evidence during closing arguments. Habeas Pet. at 5. Specifically, as outlined in the appellate court's decision, Anderson took issue with the prosecutor's statement to the jury that "Cooper testified that he saw defendant shoot in the direction of Hazziez's vehicle." *Anderson II* at 5. In reality, Cooper only testified that Anderson shot at "another guy," without ever specifying that the other guy was Hazziez. *Id.* So in essence, the prosecutor, instead of carefully walking through the evidence and explaining each link in the chain of reasoning necessary to establish the inference that the "other guy" Anderson targeted could have been Hazziez, simply told the jury that Cooper said that Anderson shot at Hazziez's car. It is easy to see how the jury might have taken that

statement to mean that Cooper, as a factual matter, said the words: "Anderson shot at Hazziez's car."

Ultimately, though, the appellate court refused to decide the merits of the issue because Anderson failed to contemporaneously object or raise the issue in post-conviction, in accordance with Illinois law. *Anderson II* at 5. This means that, on habeas review, Anderson procedurally defaulted the claim because he failed to comply with an independent and adequate state procedural rule. *Kaczmarek*, 627 F.3d at 591. Even though the appellate court engaged in a plain-error analysis (and held that there was no plain error), undertaking that analysis does not obviate the procedural default for purposes of habeas review. *Miranda*, 394 F.3d at 992.

This Court might have been able to review the issue on its merits had Anderson successfully raised a claim of ineffective assistance of counsel in his federal habeas petition. Exh. L at 2. *See also Gray*, 598 F.3d 324, 330 (7th Cir. 2010). But he did not. So, this claim is procedurally defaulted.

### D. Ineffective Assistance of Counsel

Finally, Anderson brings an ineffective assistance of counsel claim on the basis that his trial counsel erred by (1) stipulating to the gunshot-residue evidence; (2) failing to properly advise Anderson about his right to testify; and (3) neglecting to interview witnesses. Habeas Pet. at 7-8. The relevant state court decision here is the Illinois Appellate Court's 2017 opinion rejecting Anderson's post-conviction petition. *See Anderson III.*

Claims of ineffective assistance of counsel are governed by the two-part test set out in *Strickland v. Washington*, 466 U.S. 668, 674 (1984). First, Anderson must show that his trial counsel provided constitutionally deficient performance, meaning the attorney's errors were so significant that he or she "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. In assessing a lawyer's performance, courts are expected to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Then, Anderson must show that his attorney's performance prejudiced his defense—meaning that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The Court need not consider both elements if the petitioner fails to show prejudice. *Felton v. Bartow*, 926 F.3d 451, 463-64 (7th Cir. 2019).

And as always, under AEDPA, this Court's decision must be doubly deferential because "[t]he question is not whether [we believe] the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 129 (2009) (cleaned up). Under this framework, Anderson has failed to make an ineffective assistance of counsel claim.

### 1. Gunshot Stipulation

First, Anderson argues that his trial counsel was ineffective for agreeing to stipulate to the gunshot residue evidence without Anderson's consent. Habeas Pet. at 6. Specifically, Anderson asserts that his lawyer's decision was unreasonable because

28

the gunshot-residue evidence was highly favorable to Anderson, so his lawyer should have explained to the jury why the evidence was so favorable to the defense instead of simply stipulating to it. *Id.*

In rejecting this claim, the Illinois Appellate Court applied *Strickland* and reasoned that Anderson had not been prejudiced by the stipulation because his defense counsel was still able to argue to the jury the value of the gunshot residue in Anderson's defense. *Anderson III* at 8. Specifically, Anderson's lawyer explained to the jury that the stipulated gunshot evidence showed that Anderson was not in the vicinity of a gun when it was fired. *Id.* According to the appellate court, because the jury was able to hear this favorable evidence, in addition to other evidence in support of the defense, Anderson could not satisfy the prejudice prong of *Strickland*. *Id.*

On habeas review, the question is not whether the appellate court was incorrect, but rather whether the court was objectively unreasonable in rejecting Anderson's ineffective-assistance claim. Here, the appellate court fully explained why Anderson was not prejudiced by his lawyer's decision to stipulate to the gunshot-residue evidence. Not only that, but the appellate court found that the jury was able to hear the value of the evidence despite the stipulation. There was nothing objectively unreasonable about the appellate court's decision, so Anderson's ineffective-counsel claim must be denied.

### 2. Right to Testify

Same with Anderson's next ineffective-assistance claim, in which he claims that his trial counsel failed to visit him in jail, did not keep him informed of the

evidence against him, failed to advise him on his right to testify at trial, and coached him to incorrectly answer the trial court's questions about whether his decision not to testify was truly his own choice. Habeas Pet. at 6.

As the Illinois Appellate Court interpreted it, what Anderson was really claiming here was that his lawyer's general "failure to communicate with him" caused him to make the "uninformed decision not to testify." *Anderson III* at 6. But again, the appellate court reasoned that Anderson had not been prejudiced under *Strickland* because he failed to allege how additional pretrial communication would have altered the outcome of the case. *Id.* Specifically, the appellate court referred back to its own 2012 ruling in Anderson's first direct appeal, in which the court had found that "the evidence in this case was not close." *Id.* Given the "substantial evidence" against Anderson, the appellate court concluded that his counsel's failure to communicate alone would not have been enough to change the outcome of the case. *Id.* at 7.

Once again, whether or not this Court agrees with the appellate court's reasoning is not at issue. All that matters is that there is nothing in the record to suggest that the appellate court was unreasonable in its determination that Anderson's post-conviction petition failed to plausibly meet the second element of *Strickland*. So, this ineffective-assistance claim is also denied.

### 3. Neglecting to Interview Witnesses

Finally, Anderson argues that his trial counsel should have interviewed Cooper and Jackson. Habeas Pet. at 7. The argument here is that Cooper at some point admitted to Anderson and Jackson that it was *Cooper* who actually shot and killed

Hart. *Anderson III* at 7. If Anderson's lawyer had interviewed Cooper or Jackson, then that information could have been used to support Anderson's defense. *Id.*

The problem is that Anderson never submitted any affidavits from Cooper or Jackson in support of this claim. *Anderson III* at 7. And unfortunately for Anderson, Illinois law dictates that a post-conviction petition must be supported by "factual documentation" or an explanation for why that documentation could not be obtained. *Id.* (citing 725 ILCS 5/122–2). Granted, with regards to Cooper's missing affidavit, it makes intuitive sense why Cooper would not want to sign an affidavit admitting that he is guilty of murder. But that excuse does not extend to Jackson, and Anderson provided no explanation in his post-conviction petition as to why he could not get an affidavit from Jackson. So the Illinois Appellate Court denied this claim on an independent and adequate procedural ground. *Id.* at 7. And as explained above, a habeas claim is procedurally defaulted where a state court refuses to reach the merits of a petitioner's claim based on an independent and adequate state-based procedural ground. *Kaczmarek*, 627 F.3d at 591. Indeed, the Seventh Circuit has specifically noted that a habeas claim is procedurally defaulted when a state court denies a petitioner's claim due to a failure to submit affidavits of potential witness testimony in accordance with Illinois law. *Thompkins v. Pfister*, 698 F.3d 976, 986 (7th Cir. 2012). Anderson's final ineffective counsel claim has been procedurally defaulted, and he does not make any argument on cause and prejudice, so this claim is denied.

### IV. Conclusion

Anderson's habeas petition is denied. If Anderson wishes to appeal this denial of his habeas petition, then he must first obtain a certificate of appealability. Under 28 U.S.C. § 2253, "an appeal may not be taken to the court of appeals from the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court" unless the circuit justice or judge first issues the certificate. 28 U.S.C. § 2253(c)(1)(A). A certificate of appealability may issue only when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a substantial showing, a petitioner must show that "reasonable jurists could debate whether … the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (cleaned up).

Here, as explained above, the insufficient-evidence claim on the aggravated discharge conviction is a close-enough question to warrant a certificate. Under Rule 11(a) of the Rules Governing § 2254 Cases, a certificate of appealability shall accordingly issue for Anderson's insufficient-evidence claim as to the conviction for aggravated discharge of a firearm. A certificate of appealability is denied for the other claims in light of the procedural defaults and the significant deference owed to the Illinois Appellate Court.

The tracking status hearing of September 18, 2020 is vacated.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 3, 2020